The parties on appeal are Charles T. Evans et al. v. Tennessee Valley Authority Retirement System at Tennessee Valley Inquiry. Oral argument is not to exceed 15 minutes with plaintiffs. 15 minutes are to be shared by the defendants. Mr. Wall for the appellants. Good morning. Michael Wall for the appellants. I'm going to reserve 4 minutes of my time if that's okay. Plaintiffs are appealing the dismissal of two of their claims in the district court. I'd like to start with the one dealing with the excess COLA account. The Tennessee Valley Authority Retirement System established a special account called the excess COLA account to hold money to pay for COLA benefits specifically. COLA is obviously being cost of living adjustments that are meant to keep pace with inflation. And really only two rules in the big set of TBAR's rules deal with money being allowed to be taken out of the excess COLA account. 10D2 just says refer to 9B6. And then 9B6 says very specifically that in a given year the only money allowed to be taken out of the excess COLA account is an amount not to exceed, so it's a hard limit, the product of a certain formula. And the formula is what I would call the funded percentage of COLAs, meaning the percent by which all the COLA liabilities are covered by the money in the excess COLA account. In this time frame it was maybe 30 or 40% multiplied by TVA's yearly cost of living contribution to the plan. Each year TVA was supposed to give a certain amount of money to the plan to help pay for COLAs. And the product of those two things would be the maximum debit from the excess COLA account. So what happened was in 2009 the TVAR's board amended the rules. And one of the amendments was to suspend the normal funding mechanism for the plan, all the things in 9B including 9B6. So from fiscal years 2010 to 2013 none of those rules were in effect. The consequence of that was that without 9B6 being in effect there was no rule that allowed any debits out of the excess COLA account for those years. So it was impermissible to take money out. And even if somehow 9B6 stayed in effect during those years TVA stopped making its annual cost of living contributions. So if you put zero into that formula in 9B6 then for those four years there was still no money allowed to be taken out of the excess COLA account. What actually happened though was that between 2009 and 2013 the TVAR's board took more money than ever out of the excess COLA account. It paid all of this. The complaint refers generally to 9B6 which is the rule I just have been discussing. But it doesn't go into that level of detail now. I mean there's no real excess COLA claim that I could find in your complaint. In fact you're asking that if we remand it you be allowed to amend, correct? Well we ask if the court finds it necessary to reach the merits that we be allowed to amend or that the motion to amend be granted. The district court didn't think that was necessary and they have not renewed their argument that we didn't plead the claim. I'm just curious how can a district court decide a claim that was never pled? I mean the district court decided that it was properly pled in the order we were appealing from and said that it was unnecessary for us to amend because we adequately captured that claim in our complaint and then the defendants have not renewed their objection to our complaint on appeal. So what they've done is they've taken $427 million out of this account when we believe the rules, the language of the rules do not allow any debits. If your client suffered any injury, right, they got what they were entitled to as a result, correct? They have not missed a COLA payment yet but there are three, I can think of three major impacts that we believe. And they've now completely funded it, right? They've shut that down and they've committed to completely fund it. Well all we know that's happened since the close of discovery is that they've eliminated the excess COLA account. We have no idea what happened to the money or what they're doing with that money. So I can't really speak to that and it's not in the record because it's happened too recently. Your clients haven't suffered any concrete injury? No, I would disagree with that. They haven't missed a COLA payment but what's happened are three things. The first thing is it shrank by $427 million, this fund that was there to ensure COLA payments, not just the next year or the year after that but for many years in the future. Your clients would have to be there many years in the future and that's exactly the types of things the Supreme Court has said is speculative. Well, the Supreme Court. Not concrete. The Supreme Court has said in Spokio and many other cases that even the risk of harm is good enough to establish Article III standing. And, of course, under common law trust principles, which the Supreme Court has said we are to look to, any beneficiary of the trust is allowed to come to court to sue for misuse of trust assets or to enforce the terms of the trust. So we think we're really well within the normal standing principles that apply to a trust case. But you don't have any interest in the corpus like they do in a trust case, correct? I would completely disagree with that. The only people who have an interest in the trust corpus here are the beneficiaries of the plan. Those are the people for whom the money is. They don't have a vested interest in that. Well, all the benefits. What they're entitled to is their payment every year. They don't have a vested interest in the actual amount in the fund, correct? I think that's undisputed in this record. Well, for certain benefits, certainly for your pension, there's a specific formula. And if you work there long enough, you do have a vested benefit in that specific benefit. For COLAs, not so much the specific amount of a COLA. But I would refer the court to, for instance, the Scanlon case from the Seventh Circuit. There the beneficiary was a contingent beneficiary. The person wouldn't have gotten anything unless the trustee said so. And the court said this is an easy case when it comes to Article III standing, because even if you can't prove that you've lost a payment yet, and even if you're a contingent beneficiary, you still have an interest in the trust assets and under what it said were. In Scanlon, Illinois, a beneficiary had an equitable interest in the trust property. So that was different. They had an equitable interest in the property in the trust, whereas here you don't have. There's no evidence that you have an equitable interest in the excess COLA fund. I think that statement of Scanlon is just describing generally how trust law works and maps onto the Article III standard. If you're a trust beneficiary, then you automatically, by being a beneficiary, have an equitable interest in the trust. That's the nature of it, that the trustee has legal title to the assets, but you have the equitable title to the assets. But to make it more specific and concrete, because there's more to the story here than just that, when they took the money out of the excess COLA account, two big things happened. First of all, if they had taken it out of the accumulation account, which is kind of like the general operating account that pays for all the benefits, if they had done that, and that's what we say they should have done, that would have increased what's called the accrued liability of the plan or the funding shortfall. Once the normal funding mechanism kicked back in after that suspension period, TVA would have been obligated under Rule 11 to put that money back into the plan and to refund it over a period of 30 years. By doing it this way, they basically let TVA off the hook to fund the plan, which contributes again to a funding issue with the plan. But even beyond that... But again, we don't know if your client, like if your client retires next year, they won't suffer any injury if something happens 30 years down the line. But even now, today, or at the time of the filing of the complaint, even the risk of that happening would be enough to create Article III standing. But there's even a third thing. So Rule 13, in addition to the notice issues that we've briefed, has a substantive limitation on amending the plan. It says you can't reduce plan benefits that are covered by an accumulated reserve. So in the case of COLAs, this excess COLA account is a special accumulated reserve to pay for COLAs. When you reduce the accumulated reserve, you lower the amount of COLA benefits that are protected from reduction under Rule 13, and you expose them to possible future amendments that could reduce those benefits. So how do you deal with like Hughes Aircraft, which says you don't have this interest? That's a Supreme Court case, and it says any particular asset that composes a part of a plan's general asset pool, you don't have a right to. Why isn't that right on point? Well, to pick up with what I was just describing with the amendments, Hughes wouldn't address this kind of situation. So what this did was it opened the door to future amendments that would reduce your benefit entitlement under the plan. Isn't that speculative? No, it actually happened. In 2016, and this is in the record, the TVARS put this in the record. I think it's one of the declarations of Patrick Brackett. In 2016, when they eliminated the excess COLA account, what they did was they also lowered COLA benefits. They increased the eligibility age. They lessened the amount that you get. And that is made possible by the fact that they reduced that accumulated reserve back in 2009 to 2013 and shrunk that protection that those benefits would get under Rule 13. So as you can see, what they did with the excess COLA account in those years led the way to future benefit reductions by these amendments in 2016. So that, in our view, really distinguishes this situation from some of the other cases Your Honor is referring to. And they've cited, of course, a lot of ERISA cases that seem to put a pretty high bar for Article III standing. We don't think those really are a very persuasive authority here because ERISA has certain guarantees and protections that just aren't present. We don't have any pension benefit guarantee corporation insurance for the TVARS plan. We don't have any minimum funding requirements like ERISA does that ensure that the plan is going to be funded to a decent extent that give peace of mind to the beneficiaries that they're going to get their benefits down the road. Here, we just don't have those backstops. So taking $427 million out of the fund really does increase the risk in a way it might not in an ERISA plan. So we think that for these reasons, the best thing to do is to look at those basic trust principles, as the Supreme Court has said we may and should. And in cases like Scanlon from the Seventh Circuit and Washington v. Reno from this court, where the court held that the prisoners had Article III standing to object to the misuse of a statutory trust, that we're on solid ground in terms of our Article III standing. I do want to make some mention of our other claim, which is the 30-day notice claim. We just briefly argue that the TVARS board was required under Rule 13 to give 30 days advance notice of the proposed amendments before it voted on these in 2009. That is no more and no less than what every federal agency has to do under the APA if the APA applies. The APA doesn't apply. We've already held that, right, in this very case? That's true. It's absolutely true. But it uses the same language as the APA. So how would it work? The 30-day notice would be given of the proposed amendment. TVA would have the opportunity to veto, and the members would have the opportunity to comment. And then I presume that the board would consider the comments that the members had made and then perhaps revise the proposed amendment to the plan? Possibly. I don't know if the rules don't speak to whether it has to be an up or down vote on the original proposal or whether it can be amended at that time. Certainly in the APA context, you find that it gets changed a little bit and might come out differently at the end of that process. So I'm not clear from the rules how it has to work at the end, but we do think it's clear that by saying notice of a proposed amendment, that the notice has to go out before a final decision is taken. So a final decision would need to be taken at the end of the 30-day period. Exactly. And after that's done, then it's not proposed anymore. It's just it is or it isn't. It's rejected or accepted. Thank you. Thank you. Good morning. May it please the Court, Edmund Sauer on behalf of the Tennessee Valley Authority Retirement Systems, commonly known as TVARS. So if I slip and refer it to TVARS, please excuse me. With me at council table is Mr. Ed Mead, who represents TVA. With the Court's permission, we'll split time. I'll take ten minutes and Mr. Mead will take five. I first want to address the standing argument on the excess COLA claim. Your Honor, plaintiffs have not pled a concrete injury. They haven't proved a concrete injury. They informed the district court that they did not need discovery to prove an injury in this case. All they have is speculation that somehow, some way, at some point down the road, their plan benefits, their vested plan benefits might be affected. We don't think that's the case. Your theory, I gather, is that $427 million has been taken out and that that could affect them down the road. That seems logical. The $420 million hasn't been taken out. It's been used for benefits, for COLA benefits for the plaintiffs. So there's been no improper conduct alleged at all, nor could there be. Theoretically, this is a defined benefit plan versus a defined contribution plan. And as Judge Tappara pointed out, the Hughes Aircraft opinion in the Supreme Court, the LaRue opinion, and most recently this Court's opinion in Shonlen, have rejected this common law trust analogy, given the fundamental difference between defined contribution and defined benefit. Here there is no claim, nor could there be a claim, that the plaintiff's benefits have been affected or could be affected. The only way they could have that kind of claim is if there were a risk of default and the benefits somehow might not get paid in the future. There's no proof. It seems logical to think if you're taking money from a fund that's supposed to be used, it's the excess COLA fund, right, and you're taking it and using it, then it won't be there in the excess COLA fund in the future for COLAs for these very people. Well, the excess COLA account is a sub-account of the accumulation account, and I'll try my best to describe it. The accumulation account is the account that TVARS maintains for contributions from the employer from TVA, and they come in. The excess COLA account is just a sub-account within that account just to keep track of the excess contributions that TVA makes. It's not earmarked for COLAs. There are several situations where those funds can be used in TVARS' discretion to pay benefits other than COLAs, and this Court has already held that COLA benefits in any event are not vested and have not been vested. So what the Supreme Court in LaRue and Hughes Aircraft have said is you look and you see what the plaintiff's vested benefits are and if there is an effect on those benefits because that's the extent of their interest. This is very unlike the situation in Scanlon, the Seventh Circuit case, where there's an undetermined equitable interest in the body of the trust. The plaintiffs don't have that kind of interest here. The only interest, the only concrete interest they have is in their benefit payments, and there's no proof that there's any risk at all to those benefit payments being at risk. So without that, in light of this Court's opinion in Schoenlein and Lee, all we have is speculation, and that's what my friend offered, that there would be some way of TVA's contribution. The excess fund they don't pay funds into. So this is Schoenlein where Judge Clay said weren't they paying funds in there? Yes, but the benefits were set. It was a health care plan, as I understand it, and the benefits were set. And Judge Clay said, well, we know you're alleging a harm to the plan, but you haven't shown, and he quoted the language from the Supreme Court in LaRue that says, you haven't shown there's a risk of default, so you haven't been individually harmed under Spokio. So that's what I wanted to get to. Isn't your opponent claiming at the end, in 2016, they've shown that there was a problem as a result of this? In other words, he's saying in 2016, we demonstrated there was a problem as a result of them taking money out of the excess COLA. They aren't giving us what they should give us. There's no evidence that they have been affected at all in any way. I'm not sure what my friend is referring to. He might be referring to his claim that COLA benefits, if they're not vested, which they lost on previously, then they had accrued, and we had denied them their accrued benefits. The district court denied their claim, and they have not appealed that to this court, or should they, because those benefits had not been determined, and under this court's precedent, I mean, that's a loser because accrual only arises when those benefits have been determined. So there's only speculation that there has been any kind of concrete harm here, and even if they could theoretically prove harm, there's nothing in the record, nothing in the complaint establishing this theoretical harm. What about the point about ERISA, that ERISA cases are different in kind because they're insured? Yes, well, ERISA doesn't apply to T-VARS. The panel previously cited it. And Shundlin was an ERISA case. So the same theories would apply in the ERISA context. The same concrete injury requirement would apply there as it applies here. No, I thought their point, and correct me if I'm wrong, I'm sorry if I'm wrong, but I thought your friend's point was that the insurance that exists there makes that different, whereas you don't have the same insurance here. So Shundlin's distinguishable in that regard. I understand that point. Well, Your Honor, there's no allegation that TVA, who's the funding source here, isn't able to address any theoretical shortfall that might occur. So in a sense, we do have a pretty stable insurer there, and the funding ratios for the plan compared to other public pension plans are good, have varied between 70 and 80 percent. Currently right now, above 80 percent. Again, there's no proof that we're anywhere close to a risk of the plan defaulting and subjecting the plaintiff's benefits to any kind of risk. So without any harm, the court should just dismiss that claim for lack of jurisdiction under Spokio. If the court does get to the merits, I'd like to make two quick points, Your Honor. One, as the district court found, this provision, Rule 13, just provides on the notice claim, and I'll talk about briefly, just provides for notice. Notice, and it's the same 30-day period, notice to members as it is to TVA. There is no- What good is the notice to members if they can't comment adversely on the proposed amendment and then hope to convince TVARS to make a change? It's just to enable them to make changes to their retirement and investment plans. But why would a rational person make a change if they knew that TVA could veto the proposed amendment during that 30-day period? So a plan member would be foolish to make changes on a hypothetical change that's being proposed by the board. I agree with you, Your Honor. It's a useless notice to the plan members, then. No, our position is that one notice is provided at the time that the board passes the amendment. It's called the proposed amendment. Why is it the proposed amendment should be given to TVA and the members? Yes. My point is I don't understand what worth the notice to the members is if the only idea you can come up with is that they could make changes to their plans for themselves, what they thought would be smart for themselves, when TVA can veto the proposed amendment so no sane person would make a change in investments if the proposed amendment was not going to go into effect. There are situations where you would plan to make those changes, and planners have advanced that argument that 30 days isn't even long enough to make those kinds of changes, whether it's investment changes. Retirement changes in the 2009 amendment was the real key, moving the retirement age from 55 to 60. That requires more than 30 days. But there's no language in Rule 13 suggesting that the notice has to be given before the board votes. The reading that I would think would be a rational reading is that the board votes on a proposed amendment to the rules, and then presents that proposed amendment to TVA and to the members, and they have 30 days. And then at that point, if TVA has not vetoed any such proposed amendment, then the board should decide we're going to go ahead and vote the proposed amendment in, or because the members have shown what a stupid amendment it is, we will not put into effect the proposed amendment. If I may, I see I'm out of time. Please. May I respond? The reason I don't think that's a reasonable construction of the provision is the last clause in Rule 13, which says that essentially the TVA may, by notice in writing, address to the board within said 30 days, veto any such proposed amendment in which it shall not become effective. So if they do nothing, it goes in. It goes in. It's just like the President. Exactly. That's exactly right. But it doesn't say if they don't veto it, it shall become effective. And they're using the word proposed amendment here. So why isn't a logical reading, I understand that you might not prefer it, but why isn't a logical reading that there has to be some action subsequently by the board to effectuate the proposed amendment? Because there is no language in this provision that contemplates a second step for the board to take. It doesn't say it explicitly. And the language that we have in the provision, Your Honor, implies just the opposite, that it would become effective if not vetoed by the TVA. And even if I don't persuade you that that's the only reasonable interpretation, Rule 3.7, the rules require deference to our interpretation, as does the Supreme Court's decision in Auer. There have been 100. I thought the previous opinion was not too fond of Auer being applied to the board here. In that instance, that's correct, because what the panel referred to as the senior agency TVA and TVARS disagreed. And so it didn't make much sense. And TVARS had adopted inconsistent interpretations. Neither of those factors is present here. Deference is the norm here. And we've gotten 134 amendments, 134 amendments to TVARS rules and regulations in the record. Not a single one of them supports the plaintiff's reading. Not a single one. All of them contemplate notice post-vote. And so given that consistent interpretation, even if there is an ambiguity, which we don't think there is, we're entitled to deference. Thank you. Thank you. May it please the Court. My name is Edward Mead. I'm here on behalf of Tennessee Valley Authority. And I want to pick up right where my co-defendant left off, and that is on the notice provision. Another point to make in the plain language analysis, and what was critical to the district court with respect to reading Section 13, is the use of the word veto. The use of the word veto means typically the veto power is defined as the power of one governmental branch to prohibit an action by another branch, especially, as Judge Thapar said, a chief executive's refusal to sign into a law a bill passed by the legislature. So it contemplates there's already been an effective adoption, and then it would be subject to veto. And if that veto power is not exercised, that becomes the new rule. And that has been the practice of TVARS since 1939. What about the use of the word proposed amendment? And if you read in the construction of the rule, when in the last clause where it says, in which event it shall not become effective, the it is the proposed amendment. So if you read the construction as the district court did, plain language, it is that proposed amendment that will become effective, barring the TVA's veto power. And I will point out that in the first appeal, although the panel did not decide this issue, they looked at the context of amending the rules, and on page 571 of that opinion, I quote, they said, TVA wields a veto power. Amendments proposed by the board become effective only if the TVA does not exercise its veto in 30 days. Looking at this language, the previous panel had the same plain language construction that TVARS is proposing in this case. Isn't that language on 571 also applicable if the reading that I was suggesting is reasonable applies? No, I would say no, Your Honor, simply because for that proposed amendment to be able to become effective, there's nothing in the language that suggests another step needs to be taken. There's nothing in the language of this rule. In which event. In which event, yes. But I guess it says, but in which event it shall not become effective, suggests that it would automatically become effective but for the veto. Correct, Judge Larson. That would be our position. And we would agree with TVARS' position on appeal that in the first panel decision, the court was not fond of our because there had been some conflicting uses or recent conflicting decisions with respect to the meaning of whether or not COLAs were vested. We don't have that problem in this case. The first panel decision shows that you start with the plain language of the rules. They cited a case, Mitchell v. CIR, from I believe the Tenth Circuit, that lays out when you are interpreting regulations, you use the same canons of construction you would with the statute, except you move to our deference after plain language. The panel, the previous panel, applied that our deference but said it wouldn't work here. There was flip-flopping. Again, as my co-defendant argued, there hasn't been any flip-flopping. This is the interpretation. The plaintiffs have been able to cite a single time in the record of the history of TVARS where the TVARS board adopted an amendment, proposed it, and then after 30 days came back and took some other step to make it effective. That's just not how the amendment process has worked throughout the history of TVARS. And now if I may, I want to... What use is the notice to members? Do you still focus on the idea that the members can change their individual situations? I would say that it can serve that purpose and it would serve it here because if you had members who were in a position, maybe they were 57, 58, 59, they were considering whether or not they would retire, that they would have some decision. Do I want to retire now and have COLA eligibility earlier because it would have been available to them at 55? Or do I want to wait until 60? So it could serve that purpose. Isn't notice also just possible even if you can't do anything about it, it's good to know the bad news is coming? Absolutely. Maybe I won't take that trip around the world I was thinking about. Absolutely, Your Honor. And I would say that generally speaking it's you come to work at TVA, you learn what your retirement benefits are. The retirement system proposes an amendment that will become effective subject to TVA's veto, you get notice of it. So you're aware if there are changes. It doesn't have to have any meaningful impact on that particular moment, but the members are given notice that their retirement system is changing and their benefits could be impacted by that. And I'm getting close on time. If I could have just a couple of extra seconds to address the excess COLA account. The excess COLA account is not a reserve. Section 10D.5 of the rules, this is contained in our brief, says that the excess COLA account in the event of a planned termination would be dumped into the accumulation account and then used to pay for vested benefits. The district court looked at this issue below. In ruling, as my colleague argued earlier, in ruling that COLA's aren't a protected benefit under either of the two provisions of Section 13. So in the first appeal, the panel held COLA's are not a vested benefit. Section 13 also would protect reductions of accrued benefits that were subject to an accumulated reserve held therefore. On remand, the plaintiffs argued that this excess COLA account was an accumulated reserve held to protect COLA's. Because of the Sixth Circuit's intervening decision in the Frazier case, the district court held these aren't accrued. There's no protection. And oh, by the way, it's not a reserve fund because it can be used for other purposes. Plaintiffs did not appeal the decision that these are not accrued benefits, COLA's are not accrued benefits, so they couldn't be protected in any fashion under Section 13 of the rules. Your Honors, I would request that the court affirm the decision of the district court. Thank you. Beginning with the notice claim, this court in Ohio Department of Human Services, I think, and I believe this was in the 1980s, said that the manifest purpose of the APA's notice requirement, which is phrased similarly to this one, is to give people affected by the proposed amendment an opportunity to participate in the rulemaking process. It's not just a heads up. It's an opportunity to get involved so the agency can make a good decision. And we think that even though it doesn't say so in so many words, now that it is the APA, we think that is also the manifest purpose here. The word veto and the become effective language in Rule 13, we have addressed that in our brief. We really don't think that's consistent with either reading. The proposed is really the critical language. We cited a couple cases in our opening brief in which in the administrative context, the D.C. Circuit and a circuit court actually used the word veto in the same situation we're talking about. In your brief, you respond to their argument. Let's assume you're right on that and there's two possible meanings. They argue, well, we better give them deference because of our. Do you want to elaborate on what you say in your brief on that? Sure. Well, first of all, the TVARS Board has never sat down and deliberately gone through the language of the rules and done that kind of deliberative studied interpretation that's normally given deference. What they're saying they have is a practice of giving notice a certain way, which just initially doesn't carry as much weight as a studied interpretation. And I'd also point out that the practice is not perfectly consistent. We've cited a couple instances, and I can give the Bates numbers for this, TVARS 07748 and TVARS 07721. Two examples of notice that, although it's not notice like we say it should have been given, it's definitely not notice like they say is the consistent practice for 70 years. But there isn't any example of the Board taking a second step to make a rule become effective, a second vote. I don't have evidence of that, no, I don't. And we didn't go back to do that historical, you know. They've asserted in the 70 years they've always done it this way, and you have no evidence to the contrary. Well, no, the two Bates numbers I just gave are. Well, of the way Judge Larson, they've asserted they've never done it Judge Larson's way. They've never. That second vote. Right. That's great. I do not have an example. It goes into effect. I do not have an example where they've done it our way, the way I think you're describing. But they've done it different ways. And so I think at the end, what they're asking the court to defer to is bare conduct, that's not totally consistent, when the prior panel in this case has said, you know, this really isn't the kind of situation when we give our difference. So you would say for the same reasons we gave previously in Duncan, our wouldn't apply. Correct. You know, I recognize the veto and shall not become effective could be read either way. I don't think personally they cut either way. It's really the proposed language that does. But with the excess COLA account, we think the language is very clear. And I don't really hear much of a rebuttal to what 9B-6 says and the undisputed facts about the absence of those yearly cost of living contributions by TVA or the debits. It really comes down to standing. And I would like to answer something Judge DePauw asked me earlier about the equitable interest. Rule 4.3, and this is toward the end of the paragraph, says that any trust agreement holding the fund assets shall be used for the sole benefit of the members, retirees, and beneficiaries. So that is, you know, as much of an equitable interest. That was true in Hughes too. It's true in every trust. But the thing that makes the ERISA cases different are those unique features of ERISA and protections where you would understand a court might say, okay, well, you've shown some sort of mismanagement, but if you're insured and you know the plan is properly funded, then what's, you know, you've got to show me a little bit more. This is more like a common law trust, a statutory trust, like in this court's Washington v. Reno case where you don't have those safety nets. And we think that there's no question if you treat this like a non-ERISA trust that there's Article 3 standing. What about your opponent's point that this is not a reserve fund, that the excess COLA fund is not a reserve fund? What do you do with that? Right. We disagree. We have not raised that issue on appeal. But, you know, our position has always been that, yes, this is, and the board minutes expressly say this, I mean, when they created the excess COLA account, they did that to pay for COLAs, and it was earmarked for COLAs. If you look at 9B-6. Can they use it for other things? No, they may not. The things they said they can use it for, they can't. Well, what 9B-6 says, and this is where they're getting this, I think, it says that in making their overall contribution in the year, they must pay a certain amount. And that's why they're saying, well, it's really toward the overall contribution. But if you look further into 9B-6, every bit of that is cross-referenced as the COLA rules and talks about COLA funding and stuff like that. So it's clearly there to preserve a fund to pay for COLAs. And that's what I believe TVAR's representative testified to at the deposition. You know, there's just no question that that's why they call it the excess COLA account. It's for COLAs. Thank you. Thank you. Thank you all for your argument. The case will be submitted.